Jencks v. United States, "Impeachment of a witness is 'singularly important,' and that reports or [documents] can be essential to the impeachment efforts of the defendant when such material relates to witness' testimony." Id., 353 U.S. 657, 667, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103 (1957).  The record makes clear that judge prohibited petitioner's counsel from exposing facts from which the judge, as the sole triers of fact, could appropriately draw inferences relating to the credibility of a law enforcement officer. Davis, 415 U.S. at 318, 94 S.Ct. 1105.

The judge's curtailment and/or limitation of defense counsel's cross-examination of Captain Swann's past misconduct within the police department was objectively unreasonable and deprived petitioner of his Sixth Amendment right to confront and cross-examine a prosecution witness. Even though Captain Swann did not testify at petitioner's trial, his testimony at the suppression hearing had a substantial effect or influence[20] on the appellate court's decision to affirm his conviction.  The court of appeal referred to the fact that:

> The State also presented testimony from Slidell Police Department Captain Kevin Swann in connection with the motion to suppress confessions/inculpatory statements. He indicated he had contact with the defendant during his questioning at the police station.  He denied either personally, or being aware of any other officers, pressuring, coercing, or threatening the defendant to induce his cooperation. He indicated the defendant said he was ill due to some issues with his liver, but the defendant never requested immediate medical attention or an ambulance. Captain Swann testified that neither he nor any other officer made any statement to the defendant that the defendant would be provided medication in exchange for an incriminating statement.

---

20 See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

See Appendix-B (Judgment, Court of Appeal, First Circuit, p. 10). Accordingly, the trial court's denial of petitioner's right to cross-examine and impeach Captain Swann's credibility regarding his past misconducts violated petitioner's Sixth Amendment right.

For the reasons stated above, the decisions of the state courts was contrary to and based on an unreasonable application of the Supreme Court decisions cited above. Thus, this court should grant habeas corpus relief and reverse petitioner's conviction.

## ARGUMENT IN SUPPORT OF CLAIM FOUR

Petitioner contends that the decisions of the state courts that the prosecutor's admission of other crimes allegedly committed by him was not prejudicial was based upon an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### (A)

An important element of a fair trial is that the jury consider only relevant and competent evidence bearing on issue of guilt or innocence. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Supreme Court long recognized that the introduction of evidence of a defendant's prior crimes risks significant prejudice. See, e.g., Spencer v. Texas, 385 U.S. 554, 560, 87 S.Ct. 648, 651-652, 17 L.Ed.2d 606 (1967)(evidence of prior crimes "is generally recognized to have potentiality for prejudice"); Old Chief v. United States, 519 U.S. 172, 178-179, 117 S.Ct. 644, 649, 136 L.Ed.2d 574 (1997)("there can be no question that evidence of the ... nature of the prior

offense[,]" ... "carries a risk of unfair prejudice to the defendant."); Id., at 185, 117 S.Ct.

at 652 (emphasis added).  As the United States Supreme Court recognized in <u>Old Chief</u>,

with respect to the introduction of evidence of defendant's prior bad acts:

> "Courts that follow the common-law tradition almost unanimously have
> come to disallow resort by the prosecution to any kind of evidence of a
> defendant's evil character to establish a probability of his guilt. Not that the
> law invests the defendant with a presumption of good character, Greer v.
> United States, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469, but it simply
> closes the whole matter of character, disposition and reputation on the
> prosecution's case-in-chief. The state may not show defendant's prior
> trouble with the law, specific criminal acts, or ill name among his
> neighbors, even though such facts might logically be persuasive that he is
> by propensity a probable perpetrator of the crime. The inquiry is not
> rejected because character is irrelevant; on the contrary, it is said to weigh
> too much with the jury and to so overpersuade them  as to prejudge one
> with a bad general record and deny him a fair opportunity to defend against
> a particular charge. The overriding policy of excluding such evidence,
> despite its admitted probative value, is the practical experience that its
> disallowance tends to prevent confusion of issues, unfair surprise and
> undue prejudice." Michelson v. United States, 335 U.S. 469, 475-476, 69
> S.Ct. 213, 218-219, 93 L.Ed. 168 (1948)(footnotes omitted).

Id., 519 U.S.at 181-182, 117 S.Ct. 650-651 (Italics omitted).

According to La.C.E. art. 404(B)(1), evidence of other crimes, wrongs, or acts "is

not admissible to prove the character of a person in order to show that he acted in

conformity therewith." For purposes of the balancing test provided by La.C.E. art 403,

Louisiana's analogue of Fed.R.Evid. 403, "[t]he term 'unfair prejudice,' as to a criminal

defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-

finder into declaring guilt on a ground different from proof specific to the offense

charged.... Such improper grounds certainly include ... generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged...." Old Chief, 519 U.S. at 180, 117 S.Ct. at 650; see also State v. Hatcher, 372 So.2d 1024, 1036 (La.1979)(Tate, J., concurring)("Other-crime evidence may not be used to prove that the offender committed this crime simply because he had committed similar crimes in the past.").

(B)

The record reflects that, before commencement of jury selection, the trial court conducted a hearing to determine whether to permit the other crimes testimony of Catherine Boyen, the petitioner's step-daughter. Defense counsel made a specific request for all other crimes evidence the State intended to introduce at trial (Rec.p. 720-721). The prosecutor advised defense counsel that res gestae evidence does not require notice pursuant to La.C.E. art. 404(B), and may be introduced at trial (Rec.p. 722-723). However, the prosecutor did not mention the possibility of using Ms. Shante Brady's testimony for this purpose. When Ms. Brady was questioned by defense counsel regarding when the State got in touch with her, she replied that it was on the Monday of that week (Rec.p. 1805). Monday of that week was the very day that the prosecutor pretended that the only unnoticed other crimes evidence that might be introduced was res gestae evidence (Rec.p. 722-723). Plainly, the prosecutor intentionally and improperly evaded notice requirements by reserving its other-crimes evidence for cross-examination

37

or rebuttal. The testimony allowed by the trial court was highly prejudicial to petitioner's right to a fair trial.

Petitioner testified in his own defense at trial. The prosecutor asked petitioner on cross-examination if he knew a women named Shante Brady and he responded affirmatively. He was next, twice, asked if he had ever tried to shoot her up and both times responded, "Never" (Rec.p. 1708). The prosecutor then called Ms. Brady as a rebuttal witness. Defense counsel immediately requested a bench conference. At the bench conference, the prosecutor said that Ms. Brady would testify that petitioner had shot her up with Dilaudid (Rec.p. 1800). Defense counsel then argued that the defense had received no notice of this evidence of other crimes. The prosecutor responded that "[t]his is for credibility" (Rec.p. 1801). The court then retired the jury to address the issue (Rec.p. 1801). Next, Ms. Brady was questioned by the prosecutor and cross-examined by defense counsel out of the presence of the jury (Rec.p. 1802-1805). Ms. Brady claimed that in April of 2002 petitioner had injected her with what he told her was Dilaudid (Rec.p. 1802, 1804).

When the judge asked the prosecutor the purpose of Ms. Brady's testimony, he responded that it was to impeach petitioner's claim that he never injected Ms. Brady (Rec.p. 1805). Defense counsel then argued that he had requested Article 404(B) notice and he was not provided with notice regarding Ms. Brady's claim (Rec.p. 1805). Defense counsel went on to argue that the notice requirement of Article 404(B) should not be

circumvented "by simply saying that the State opened the door in cross-examining the defendant." (Rec.p. 1806). The court then permitted the testimony, concluding that, "In this particular instance, Prieur[21] notice or evidence of other crimes noted [sic] is not required on rebuttal when the defendant makes the other crimes evidence relevant by his own testimony." (Rec.p. 1807-1808).

There was no further discussion of the issue and the trial court did not change its decision to permit Ms. Brady to testify and noted defense counsel's objection to the court's ruling (Rec.p. 1812). The trial court gave a limiting instruction before Ms. Brady testified. However, the court gave a limiting instruction for La.C.E. art. 404(B) and not for impeachment (Rec.p. 1813).

Defense counsel filed discovery motions prior to trial and specifically asked the State if it intend to use or prove at the trial similar acts by the defendant for the purpose of establishing system, pattern, and intent (Rec.p. 89). The State advised defense counsel in response to his discovery motion that, "[t]he State gives written notice of its intent to introduce evidence of other offenses admissible under L.C.E. Article 404 as described in the attached discovery. Such evidence is admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or is an integral part of the act or transaction that is the subject of the current proceeding." (Rec.p. 104). However, no documents were attached because the State had only offered open file discovery.

---

21 State v. Prieur, 277 So.2d 126, 129 (La. 1973)

The testimony of Ms. Brady was not concerning another conviction obtained by petitioner. It was clearly extrinsic evidence of another crime used to attack his character, and was inadmissible.  The testimony of Ms. Brady was not admissible as rebuttal evidence because it was not offered to rebut evidence offered by the defense, but was evidence that was intentionally withheld from the State's case-in-chief.  The questions that petitioner answered about Ms. Brady on cross-examination by the prosecutor were not "evidence adduced by the defense to strengthen its own case. The questions of the prosecutor was part of his plan to evade the notice requirement and gain a tactical advantage at trial. The trial court was clearly in error by rewarding the prosecutor for his deception.

(C)

Petitioner contends that the trial court's admission of Ms. Brady's rebuttal testimony regarding other offenses allegedly committed by him deprived him of a fair trial, due to the prejudicial nature of the evidence.  The erroneous admission of Ms. Brady's testimony had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). "[W]hen a state court admits evidence that is 'so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.' " Dawson v. Delaware, 503 U.S. 159, 179, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992)(quoting Tennessee v. Bane, 510 U.S. 808, 114

40

S.Ct. 52, 126 L.Ed.2d 23 (1993)). In conducting this analysis, it is irrelevant whether the evidence was correctly admitted pursuant to state law. Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Rather, the court's inquiry is whether the admission violated the Constitution. Id. at 68, 112 S.Ct. 475.

The Fifth Circuit Court has held that when evidence of an extraneous offense is wrongly admitted, habeas relief is proper if the error is of such magnitude that it resulted in "fundamental unfairness." Hafdahl v. Johnson, 251 F.3d 528, 536 (5th Cir. 2001) (quoting Blankenship v. Estelle, 545 F.2d 510, 516-17 (5th Cir. 1977)). The habeas court should assume that the admission of the other crimes evidence was error and determine whether such error was harmless under Brecht. See Corwin v. Johnson, 150 F.3d 467, 476 (5th Cir. 1998)(assuming admission of evidence constituted error and determine whether the petitioner was entitled to federal habeas relief pursuant to Brecht).

The testimony of Ms. Brady, if believed, was particularly damaging. She claimed that in 2002 petitioner invited her to his hotel room on the pretext that her friend Tina would be there and to meet petitioner step-daughter (Rec.p. 1814). She testified that only petitioner and his step-daughter were present when she arrived, that his step-daughter left after five minutes and then petitioner injected her with Dilaudid (Rec.p. 1815). She went on to claim that he then injected her with more Dilaudid. Then she got sick, went to the bathroom to throw up, and when she left the bathroom he was waiting with a needle. She didn't take her clothes off but she didn't have any clothes on (Rec.p. 1815). She claimed

that when she went to petitioner's room she did not know what was going to happen and that it was the first time she had been injected with Dilaudid (Rec.p. 1816).

Ms. Brady also testified that she wrote a letter to the prosecutor in 2004 after she read the newspaper article about petitioner's arrest because she felt bad that if she had done something earlier then it wouldn't have happened to Ms. Roshto (Rec.p. 1826).

There was no evidence that petitioner had invited Ms. Roshto over to his motel room. In fact, he testified that she had telephoned him at approximately 11:30 p.m. on the night of January 28, 2004, because she wanted to come over and stay. She told him that she had a fight with her boyfriend and was upset. At first he said no but then relented (Rec.p. 1653-1654). Petitioner denied having sex with her. He explained that she was fully clothed until his step-daughter, Ms. Boyen, arrived on the morning of January 29, 2004, and removed her clothes to put in a tub of cold water in an attempt to revive her (Rec.p. 1655).

The State was not able to eliminate the possibility that Ms. Roshto had injected herself or been injected before or after she arrived at petitioner's motel room shortly before midnight on January 28, 2004, or that someone else had injected her while petitioner slept. There was no one who claimed to have seen how or by whom Ms. Roshto was injected with Dilaudid.

In sum, the testimony of Ms. Brady, if believed, destroyed petitioner's credibility. The jury was free to believe petitioner's testimony and to disregard the testimony of those

witnesses who contradicted his testimony.  In a case wherein there is no corroboration on either side, the importance of petitioner's credibility becomes so significant that prosecutorial error attacking his credibility cannot be harmless beyond a reasonable doubt.  Therefore, this court should grant habeas corpus relief and reverse petitioner's conviction.

<u>ARGUMENT IN SUPPORT OF CLAIM FIVE</u>

Petitioner contends that his defense counsel was constitutionally ineffective because he (a) failed to perform proper pretrial discovery and investigation; (b) failed to prepare and present a viable defense; (c) failed to present a defense of negligent homicide and to request a special jury instruction on same; (d) failed to acquire experts to assist in preparation and presentation of the defense when the motion filed for expert requesting funds was granted; (e) and the cumulative effect of defense counsel's errors.

(A)

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence." U.S.Const.amend. VI.[22] The "Assistance of Counsel" means the "effective" assistance of counsel. See, e.g., <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

A reviewing court must reverse a conviction if the petitioner establishes: (1) that

---

22  The Sixth Amendment has been made applicable to the States under the Fourteenth Amendment.  See <u>Gideon v. Wainwright</u>, 372 U.S. 335, 345, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963).

counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. 2052. In other words, counsel's error must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. With respect to prejudice, the Strickland test does not merely question whether the outcome of the proceeding would have been different, but also looks at whether the verdict was fundamentally unfair or unreliable. Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

The Supreme Court has also recognized that "the right to effective assistance of counsel ... may in a particular cased be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial. Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)(citing United States v. Cronic, 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984), and Strickland v. Washington, 466 U.S. at 693-696, 104 S.Ct. at 2067-2069.). Petitioner will demonstrate below that his attorney did not "subject the prosecution's case to meaningful adversarial

44

testing." <u>United States v. Cronic</u>, 466 U.S. at 658-89, 104 S.Ct. 2039.  When "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment right that makes the adversary process itself presumptively unreliable." <u>United States v. Cronic</u>, 466 U.S. at 659, 104 S.Ct. 2039.

A) <u>Defense Counsel Failed to Perform Proper Pre-trial Discovery and Investigation.</u>

Defense counsel must engage in a reasonable amount of pretrial investigation, and "at a minimum . . . make an independent investigation of the facts and circumstances of the case." <u>Nealy v. Cabana</u>, 764 F.2d 1173, 1177 (5th Cir. 1985). In general, defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. 2052.

Petitioner submits that his attorney, Martin Regan, failed to obtain the blood evidence in a timely manner.  Even though motions were filed and hearings held on the matter, Mr. Regan failed to follow through with this evidence (See Appendix-E; Exhibit-A) which was crucial to the defense.  A blood sample was drawn from petitioner on the day of the incident on January 29, 2004. The blood sample bears Slidell Police Department evidence number 65304. Defense counsel was aware of this evidence and its importance to the defense.  However, the first time the blood suppression issue is in the record is on February 2, 2005 in a bond reduction motion. (See Appendix-E; Exhibit-J, p. 113).  The State repeatedly proffered excuses to preclude this evidence from being tested

and sadly, defense counsel failed to do anything about it. (Appendix-E; Exhibit-B). This failure resulted in a 39-month delay which resulted in the toxins within the blood sample diminishing and petitioner's defense was lost. (Appendix-E; Exhibit-C).

If physical evidence has been lost or destroyed by the State, the factors to be considered regarding whether a defendant's right to due process has been prejudiced are: (1) the materiality of the evidence to guilt or punishment; (2) prejudice to the defendant resulting from loss or destruction; and (3) good or bad faith on part of the State. State v. Foret, 447 So.2d 1265 (La.App. 1 Cir. 1984); U.S. Const. amends. 5, 14. Duty to preserve evidence must be limited to evidence that might be expected to play a significant role in the defense. California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). In the instant case, the blood evidence was crucial in proving petitioner's intoxication at the time of the alleged offense as well as his initial contact with the police. Unlike the outcome in  Trombetta, the chances are very high that the evidence would have been a powerful piece in petitioner's defense.

Unfortunately, it was too late and the toxins within the blood evidence had diminished to 9.5 nanograms per milliliter. (Appendix-E; Exhibit-D). The State claims that petitioner had metabolized all but 20% of the expected amount of Dilaudid. (State's response, p. 4). The State makes this assertion without using any scientific source. The District Attorney is no expert in toxicology. The State makes a "conclusory" statement without providing a source for the scientific information cited.

46

Petitioner suffered prejudice in two ways. It resulted from the State intentionally withholding the evidence, and defense counsel's ineffective assistance in failing to assure chain of custody, failing to assure that the evidence was located, acquired, and tested in a timely manner. Petitioner was prescribed 965 4mg Dilauded in addition to 1440 of Lorcet 10 pills within a 9-week period. (Appendix-E; Exhibit-E). Equaling an allotment of 15 Dilauded and 22 Lorcet 10's per day. It is untenable to argue that the blood evidence would not have shown a high level of toxins had the blood evidence been submitted for testing in a timely manner. During hearing held pertinent to this issue, the prosecutor questioned petitioner asking the following:

> "We have heard no testimony during the course of this hearing how reliable this test result is based on the circumstances of the degradation of the sample. The passage of time, the amount of the sample. We have heard no testimony. You would agree with that?"

(Appendix-E; Exhibit-D, p. 518).

Moreover, the prosecution was aware that the defense had no expert to provide the testimony necessary to prove his claims. No defense expert ever testified at trial. It must be remembered that Motion for Funds to Acquire Expert Assistance was filed and granted. (Exhibit-F). The trial court allotted $5000.00 but defense counsel failed to acquire expert assistance. See Hinton v. Alabama, 571 U.S. ___, 134 S.Ct. 1081 (02/24/14). Had defense counsel used the funds allotted and acquired the expert, there would have been testimony regarding the reliability of the test result, chain of custody,

47

and degradation of the sample over the 39-month passage of time.

It is pertinent to note that during hearing of Motion to Recuse the District Attorney's Office, the trial judge himself admonished defense counsel for his failure to follow through on the testing of the blood evidence over extended period of time. The trial judge informed defense counsel that this issue had come before the court at least three times and he had given counsel the benefit during this time of looking for a crime lab all over this nation. (Appendix-E; Exhibit-G).

Petitioner submits that the trial judge's comments support his allegation that defense counsel was utterly ineffective. The blood evidence was crucial in proving petitioner's mental incapacity at the time of the alleged offense. The victim's mother testified regarding the conduct of the officers during interrogation when they used petitioner's withdrawal symptoms to obtain a coerced statement. (Appendix-E; Exhibit-H). Thus, he had a right to test this evidence and a right to have an independent chemical analysis performed on the blood evidence. Arizona v. Youngblood, 448 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281(1988). Most importantly, had defense counsel acquired the assistance of an expert to assist with preparation and presentation of the defense, there is more than a reasonable probability that the result of the proceeding would have been different.

It is pertinent to remember in Corporal Kahrs' case narrative, he states that petitioner could not give consistent and coherent details when he arrived at the scene.

48

(Appendix-E; Exhibit-I). Petitioner was transported to the police station within 15 minutes of the 911 call being placed. It is untenable to argue that petitioner had the requisite mental capacity to give a voluntary statement/confession when he was so intoxicated that he could not give consistent and coherent details. Defense counsel failed to properly challenge the unlawful actions of the police officers when he had the facts and/or evidence to do so.

Additionally, the syringe presented by the State was located far away from the scene. No scientific evidence was presented linking petitioner or the alleged victim to the syringe and this evidence should have been suppressed. The syringe was the only physical evidence in the courtroom alleged to have been used by petitioner. "There was no claim that that syringe was ever the instrument used in injecting the victim." (State's response, p. 6). The syringe was paraded before the jury throughout the duration of the trial as if it were the murder weapon. This obvious display tainted the jury and defense counsel failed to object. Again, acquiring expert assistance was crucial regarding this issue who could have testified that the syringe proffered would not hold four Dilaudid. The State called Capt. Harry O'Niel, the director of the St. Tammany Parish Crime Lab, as a rebuttal witness to refute petitioner's claim that the .30 cc syringe introduced as evidence could not hold four, 4mg Dilaudid. Capt. O'Niel was qualified as an expert in the preparation of street narcotics to be injected. There are multiple methods to prepare drugs to be injected. Capt. O'Niel testified as to how the injectables are prepared through

49

a spoon/cooker and then heated, then the liquid toxins drawn into the syringe. This was done without any reliable testing of the syringe in question or a compatible one. He testified that it may take filling the syringe up twice to draw up the four Dilaudid. The State's theory from the beginning was that there was two injection sites on the victim. In Rena Boyen's statement coerced and written as the Slidell police told her to say that the petitioner confessed to her that he had injected the victim twice. An autopsy performed on the victim confirmed that there was only one injection site, but the State's theory was that the victim was injected with four Dilaudid. This testimony was highly prejudicial that was presented to the jury supporting the State's claim that petitioner submits it is impossible to prepare the Dilaudid as Capt. O'Niel testified to and fit four 4mg Dilaudid in to the .03 cc syringe. Had defense counsel hired the necessary experts there is a reasonable probability that this prejudicial evidence would not have been presented to the jury. The petitioner through his drug abuse history has never used that method to inject Dilaudid; he used a method known as "cold shaking" which expert testing and their testimony would prove scientifically that it is highly unlikely that much more than one 4mg Dilaudid much less 4, 4mg Dilaudid could fit in a .30 cc syringe.

Petitioner made known to the trial court through numerous letters that he was sorely aggrieved by defense counsel's failures through repeated instances of not appearing in court and diligently obtaining the blood evidence. (Appendix-E; Exhibit-J). The type of breakdown in the adversarial process that implicates the Sixth Amendment is

not limited to counsel's performance as a whole; specific errors and omissions may be the focus of a claim of ineffective assistance as well. United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 2048 (1984). Petitioner's need for pretrial investigation was essential for effective assistance of counsel. Consequently, counsel's errors deprived petitioner of due process of law, the right to a fair trial and the right to present a defense.

B) Failure to Prepare and Present a Defense

The Sixth Amendment of the United States Constitution guarantees the right to present a defense. U.S. Const. Amend. 6; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). As a result of Defense Counsel's failure to act as Counsel demanded by the Sixth Amendment to the United States Constitution, Petitioner was denied the Constitutional right to present a defense.

Petitioner and Ms. Roshto both suffered from severe addictions. Dr. Sebatier illegally over prescribed large amounts of narcotics to petitioner which enabled his addiction. (Appendix-E; Exhibit-L). Dr. Sebatier later was required to surrender his medical license.(Appendix-E; Exhibit-E). Under Louisiana law, the burden was upon petitioner to prove his insanity. "If the circumstances indicate that because of a mental disease (severe addiction) or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." La. R.S. 14:14 (emphasis added).

As a result of his severe addiction and heavy intoxication at the time of the alleged

51

offense, petitioner submits that he was "incapable of distinguishing between right and wrong with reference to the conduct in question." Defense Counsel chose to present the defense of intoxication. No matter which of the above defenses was chosen by trial counsel, it was pertinent to acquire expert(s) to assist in preparing and presenting the defense.

Defense Counsel made no attempt to present Dr. Sebatier and his illegal actions to support petitioner's defense; nor did counsel present an expert to testify to any or all of the above. The State indicated in its response that defense counsel argued insanity/intoxication during the motion hearings. However, the jury never heard the arguments and were never allowed the opportunity to hear from Dr. Sebatier or another expert concerning petitioner's level of intoxication.

Petitioner submits that he did not commit second degree murder for he could not have had the specific intent to kill or commit great bodily harm. Rather, due to his severe addiction and heavy intoxication which was further enabled by Dr. Sebatier's illegal actions, petitioner's actions was involuntary and he did not know the difference between right and wrong at the time of the alleged offense. However, when trial counsel never allowed the jury to hear from Dr. Sebatier or another expert regarding petitioner's level of intoxication, "[c]ounsel failed in his duty to bring to bear such skill and knowledge to render the trial a reliable adversarial testing process." Strickland, 466 U.S. 668,104 S.Ct. at 2065 (citing Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 63-64, 77 L.Ed. 158

(1932). The plethora of errors described above clearly shows that trial counsel was ineffective.

## C) Counsel Failed to Present a Defense of Negligent Homicide, and Request a Special Jury Instruction on Same

Petitioner submits that the facts and circumstances of this case suggest a defense of negligent homicide but defense counsel failed to request a special jury instruction for that charge. Counsel's failure in this regard was not a tactical decision, but prejudicial error. See State v. Sepulvado, 25 So.3d 899 (La.App. 2 Cir. 10/28/09) and State v. Chambers, 933 So.3d 200 (La. App. 3 Cir 5/24/06).

In United States v. Cronic, 839 F.2d 1401, 1403 (10th Cir. 1988), the conviction was originally reversed by the Tenth Circuit at 675 F.2d 1126. The Supreme Court then reversed that decision, and the case was sent back down to the district court, which denied relief. When the case went back to the Tenth Circuit for the second time, the court found that trial counsel had completely failed to present the obvious defense of good faith, and also failed to request a jury instruction on good faith, the Court of Appeals saw substantial prejudice and reversed. Id.

In this case, defense counsel chose to abandon the intoxication defense even though other viable defenses were available. There was no strategic or tactical reason for counsel's failure to present a defense of negligent homicide and request a jury instruction on that charge. The jurisprudence does not require the reviewing court to "fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all." Moore v. Johnson, 185 F.3d 244, 261 (5th Cir.

53

1999). Defense counsel's deficient performance in this respect fell below an objective standard of reasonableness and that a substantial or significant possibility existed that the verdict of the trier of fact would have been affected.

D) <u>Defense Counsel was ineffective for his failure to acquire experts to assist in preparation and presentation of the defense when the motion filed for expert requesting funds was granted</u>.

Defense Counsel failed to timely secure a lab, and an expert (toxicology, psycho-pharmacology, and/or addictionology) who could have testified pertinent to the reliability of the test result, chain of custody, and degradation of the sample over the 39-month passage of time. (Appendix-E; Exhibit-A). Defense Counsel was ineffective when he failed to obtain an independent expert in the fields of toxicology, psycho-pharmacology, and addictionology (substance abuse). Motion to Obtain Funds for Expert was filed by the defense and granted by the Court on March 13, 2006. However, defense counsel failed to acquire these experts when they were crucial to the defense. (Appendix-E; Exhibit-F).

Petitioner was a drug addict with repeated commitments and a history of treatment for substance abuse. Expert assistance and testimony was crucial pertinent to the reliability of the test results of the blood evidence, chain of custody, and degradation of the sample over the 39-month passage of time. Defense Counsel's failure to acquire expert assistance when motion for same had been granted was grossly ineffective and substantially prejudiced the defense. Petitioner submits that without expert assistance and

54

testimony, he was deprived of his defense.

Jurors do listen to, are influenced by, and rely upon the testimony of such experts and a trial may be fundamentally unfair when a party is left without expert assistance. Ake v. Oklahoma, 470 U.S. 68, 80, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Calling experts in this case was pertinent because (1) the results from the toxicology reports were crucial to the defense in suppressing evidence, statements or confession, and (2) crucial in proving petitioner's innocence of the crime charged, and (3) countering the State's case. Had defense counsel acquired the assistance of an expert in preparation and presenting the defense, as well as countering the reports and testimony of State experts, there is more than a reasonable probability that the outcome would have been different.

E) Cumulative effect of defense counsel's errors and conclusion

Petitioner respectfully submit that he is entitled to a reversal of his convictions based on the accumulation of errors committed during his trial. With respect to his ineffective-assistance-of-counsel claims, the Supreme Court has recognized that "the right to effective assistance of counsel ... may in a particular cased be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial. Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)(citing United States v. Cronic, 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984), and Strickland v. Washington, 466 U.S. at 693-696, 104 S.Ct. at 2067-2069.)

The United States Supreme Court has further held that the combined effect of

multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 1577, 131 L.Ed.2d 490 (1995); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Chambers v. Mississippi, 410 U.S. 284, 298, 302-03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)(combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); see also Taylor v. Kentucky, 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness...."). A cumulative error claim allows for relief when, although no single error independently warrants reversal or rises to the level of constitutional violation, the effect of multiple errors caused the defendant to suffer undue prejudice. Chambers, 410 U.S. at 290 n. 3, 93 S.Ct. 1038. As such, the cumulative effect and prejudicial impact of all the errors committed in this case deprived petitioner of his due process right to a fair trial.

In this case, defense counsel's actions and/or inactions deprived petitioner of his right to due process of law, his right to a fair trial, his right to present a defense. Counsel's deficient representation rendered the trial fundamentally unfair and unreliable. "If counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment right that makes the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. at 659, 104

S.Ct. 2039. The High Court has recognized -- as in the instant case -- that counsel's ineffectiveness may have been "so likely to prejudice the accused" that any ineffective assistance concerns should be evaluated under the Cronic standard. See Wright v. Van Patten, 552 U.S. 120, 128 S.Ct. 743, 746 n. 1, 169 L.Ed.2d 583 (2008)(per curiam) (recognizing that Cronic's presumption of prejudice applies "when 'there [is] a breakdown in the adversarial process,' such that 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing' " (quoting Cronic, 466 U.S. at 662, 659, 104 S.Ct. 2039)).

The record makes clear that "there was a breakdown in the adversarial process" in this case. The ineffectiveness of trial counsel, as well as the accumulation of errors committed during petitioner's trial, made "the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. at 659, 104 S.Ct. 2039. In light of the cumulative effect and prejudicial impact of all the errors committed in this case, the Court should apply Cronic's "presumption of prejudice" and reverse petitioner's convictions.

ARGUMENT IN SUPPORT OF CLAIM SIX

Petitioner contends that his conviction under the second degree murder statute, La.R.S 14:30.1, which includes §§ (3) and (4), in unconstitutional as applied to him by imposing a mandatory life sentence for an offense which lacks any intent to kill or inflict great bodily harm, without first allowing the sentencing court the ability to consider the characteristics of a petitioner and the details of his offense before sentencing him.

57

(A)

Petitioner submits that Louisiana's Second Degree Murder, La. R.S. 14:30.1, which includes Sections (3) and (4) is unconstitutional as applied to him by imposing a mandatory life sentence for a crime which lacks any intent to kill or cause bodily harm, without first allowing the sentencing authority the ability to consider the characteristics of a petitioner and the details of his offense before sentencing him. The statute as applied violates his protected right against cruel and unusual punishment guaranteed by the Eighth Amendment to the United Constitution and Article 1, § 20 of the Louisiana Constitution.

The State highlighted that sentencing is not a ground for relief under La. C.Cr.P. art. 930.3. Challenging a statute's constitutionality is a ground for relief under La. C.Cr.P. art. 930.3(5) allows a conviction to be challenged when the statute creating the offense for which he is convicted and sentenced is unconstitutional. As a general matter, a statute is presumed to be constitutional, and the burden of showing otherwise falls to the challenger. State v. Rochon, 75 So.3d 876 (La. 2011); State v. Muschkatt, 706 So.2d 429 (La. 1998). Criminal statutes are given a genuine construction according to the fair import of their words, taken in their usual sense, in context, and with reference to the purpose for the provision. See State v. Interiano, 868 So.2d 9 (La. 2004).

Attacking the constitutionally of a statute must be specifically pleaded and the grounds for the claim particularized. The Louisiana Supreme Court has expressed the

58

challenger's burden as a three step analysis. First, a party must raise the unconstitutionality in the trial court; second, the unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized. The purpose of these procedural rules is to afford interested parties an opportunity to brief and argue the constitutional issues. Briefing and arguments provides the trial court with thoughtful and complete arguments relating to the issue of constitutionality and furnishes reviewing courts with an adequate record upon which to consider the constitutionality of the statute. State v. Bertrand, 6 So.3d 738 (La. 2009). However, petitioner was not afforded an opportunity to establish the factual and legal basis of his claim by being denied an evidentiary hearing to establish a record.

Additionally, the Louisiana Constitution protects against excessive sentences and permits a court to determine both whether the sentence of a particular offender is excessive, but also whether the range of sentence authorized by the statute is excessive. State v. Guajardo, 428 So.2d 468, 472 (La. 1983). "The deliberate inclusion by the redactors of the Constitution of a prohibition against "excessive" as well as cruel and unusual punishment broadened the duty of this court to review the sentencing aspects of criminal statutes." State v. Goode, 380 So.2d 1361, 1363 (La. 1980).

A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than a purposeless imposition of pain and suffering and is grossly out of proportion of the severity of the crime. State v.

59

Dorthey, 623 So.2d 1276, 1280 (La. 1993). A sentence is grossly disproportionate when the crime and punishment are considered, in light of harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La. 1992). It is well settled that legislature has the unique responsibility to define criminal conduct and to provide for the penalties to be imposed against persons engaged in such conduct. State v. Dorthey, 623 So.2d at 1278. The penalties provided by the legislature reflect the degree to which criminal conduct affronts society. State v. Davis, 666 So.2d 400, 407 (La.App. 1 Cir. 1995). Courts must apply the penalties unless they are found to be unconstitutional. Dorthey, 623 So.2d at 1278.

Petitioner met all requirements of challenging the constitutionality of a statute by raising it in the trial court, pleading with specificity, and outlined the basis for the unconstitutionality. He specifically plead in his original application that Louisiana's Second Degree Murder Statute, La. R.S. 14:30.1(3) as applied to him, is unconstitutional in that both the United States and Louisiana Constitution's prohibition of cruel and unusual punishment which "guarantees individuals the right not to be subjected to excessive sanctions". U.S. Const.Amend. 8; La. Const. Art. 1, § 20.

In 1987, the Louisiana Legislature added section (3) and (4) of La. R.S. 14:30.1 which further defined the crime of second degree murder. It now includes when the offender unlawfully directly or indirectly distributes or dispenses a controlled dangerous substance listed in Schedules I or II which is the direct cause of the death of the recipient

60

who ingested or consumed the controlled dangerous substance. In 2010, the burden was lessened and even greater than that of 2004, totally eliminating the specific intent to kill or inflict great bodily harm, or in the perpetration or attempted perpetration of a violent crime that has historically been necessary to convict on second degree murder prior to 1987. It is pertinent to note that distribution of Schedule II is not a violent crime enumerated in La. R.S. 14:2(B). Petitioner submits that distribution or dispensing being inclusive in La. R.S. 14:30.1, second degree murder, is unconstitutional on its face where there is no specific intent to kill or commit great bodily harm, nor in the perpetration or attempted perpetration of a violent crime. The offense committed here is no more than a negligent homicide, not second degree murder. Considering the circumstances of petitioner's involuntary intoxication by being illegally overly prescribed scheduled medication, and his level of intoxication at the time of the alleged offense. It should be emphasized that Dr. Sabatier surrendered his permit to prescribe controlled dangerous substances and medical license.

Since that amendment, the United States Supreme Court ruled in Miller v. Alabama, 567 U.S. ____, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), that the Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." Roper v. Simmons, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). That right "flows from the basic precept of justice that punishment for crime should be graduated and proportioned" to both the offender

and the offense. Two strands of precedent reflecting the concern with proportionate punishment come together here. The first has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641 (2008). Thus, Roper v. Simmons held that the Eighth Amendment bars capital punishment for children, and Graham v. Florida concluded that the Amendment prohibits a sentence of life without the possibility of parole for a juvenile convicted of a non-homicide offense. Graham v. Florida, 560 U.S. 448, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2009).

The basis of these decisions focuses on the culpability of the petitioner. Roper and Graham establish that children are constitutionally different than adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, ... "they are less deserving of the most severe punishments." Those cases relied on three significant gaps between juveniles and adults. First, children have a "lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and needless risk-taking." Roper at 569. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. Id. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions

62

less likely to be "evidence of irretrievable depravity Id. at 570.

Roper and Graham emphasized that the distinctive attributes of youth diminish the penological justifications of imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. In this case we are faced with a different, but very real and seriously diminished culpability. At the time of his conviction petitioner was a 48 year old man with a long history of severe drug addiction. Blacks Law Dictionary Abridged 6th Ed. defines Addict: "Any individual who ...is or has been so far addicted that the use of such narcotic drugs as to have lost the power of self-control with reference to his addiction."

It is common knowledge that drug addiction dominates its victims, not only mentally but physically as well. Petitioner claims that because of his long history of addiction (See original post-conviction relief application and exhibits for full history), and his heavy use of prescription drugs at the time of the alleged crime, his culpability was reduced to less than that of a juvenile, which merits the same protection from a mandatory sentence of life without parole, without allowing the sentencing judge the necessary discretion to consider petitioner's severe drug addiction and attended characteristics, and from assessing whether the law's harshest term of imprisonment proportionately punishes him before sentencing.

Moreover, petitioner was using drugs illegally prescribed to him by Dr. Sabatier who prescribe 120 Delaudid and would prescribe another 120 the next day. Petitioner's

addiction was furthered by receiving prescriptions of the same medications from other doctors to even increase the dosages of 2 to 4 at a time, every 45 minutes to an hour and a half. (Appendix-E; Exhibits E & L). The vast amount of prescribed drugs being taken completely incapacitated him and reduced his culpability to a degree lesser than that of a juvenile.

The autopsy report states Poli-Substance Drug Toxicity of Dilauded, Soma and Xanax was the cause of Ms. Roshto's death. (Appendix-E; Exhibit-K). Petitioner is only accused of providing the Schedule II Dilauded. It would be impossible to detect what sequence the 3 drugs were consumed, thus not proving which was the direct cause of her death. As a result of how the statute is worded, the judge had no discretion to consider those factors. Persuasively, in the case sub judice, the application of the statute leads to absurd results because petitioner had no intent to kill or commit great bodily harm. Petitioner submits that La. R.S. 14:30.1, which includes Sections (3) and (4) is unconstitutional as applied.

The legislature realized that by listing I through V Scheduled drugs in the amended statute of 2010, to include "or any combination thereof" makes it lesser to convict than in 2004 when which sequence the drugs were consumed, made it more difficult to convict. In this unusual incident, petitioner was a drug addict using prescribed medications. His only crime was the abuse of his own prescribed medication. Petitioner was intoxicated almost to the point of being unconscious when the alleged victim arrived.

Upon his daughter's later arrival and discovery that her friend was unresponsive when trying to awake her, she alerted petitioner and he called 911 emergency for help. This incident indicates negligence and/or an accident rather than second degree murder. The alleged victim was a major contributor to her own death. Petitioner was unaware of what had happened until notified by his daughter that the alleged victim was unresponsive.

Petitioner submits that <u>Miller</u>, supra, allows the trial judge or jury to fix punishment with the discretion to consider a juvenile's youth and immaturity, including such mitigating factors as a dysfunctional upbringing, <u>abuse of alcohol and/or drugs</u> as a juvenile, and <u>whether or not he could be rehabilitated before deciding to impose a different punishment</u>. "Moreover, defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of such punishments than are murders." <u>Graham v. Florida</u>, 560 U.S. 48, 130 S.Ct. 2011 (2009). Having a mandatory life sentence for an offense with the circumstances and characteristics of this particular individual should be unconstitutional as well. Even though petitioner is an adult that suffered from addiction which is a disease and is treatable. Courts and legislatures today recognize that the "war on drugs" has been a failure. Today, these courts and legislatures recognize that as addiction is a disease and the person addicted can be rehabilitated that treatment in lieu of incarceration is preferred.

Petitioner submits that the circumstances presented support his claim that the statute is unconstitutional as applied. Since there was no evidence that petitioner had the

specific intent to kill or commit great bodily harm there was no crime of second degree murder committed in this case. Thus, petitioner's conviction under Sections (3) and (4) of the second-degree murder statute, La. R.S. 14:30.1, is unconstitutional and violates his protected right against cruel and unusual punishment guaranteed by the Eighth Amendment to the United Constitution.

## ARGUMENT IN SUPPORT OF CLAIM SEVEN

Petitioner contends that prosecutorial misconduct occurred when the district attorney withheld blood evidence and when he obtained testimony by threatening witnesses.

### (A)

The United States Supreme Court has warned long ago that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed.2d 1314 (1935). The Louisiana Supreme Court "has repeatedly stated [that] prosecutorial misconduct that affects verdicts will not be tolerated and will result in reversals of convictions." State v. Green, 416 So.2d 539, 541-42 (La. 1982)(footnote omitted)(emphasis added).  "As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed.2d 791 (1935), [the Supreme Court] made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' " Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

66

(B)

1) The State Withheld Exculpatory Blood Evidence

The suppression of evidence favorable to an accused by the prosecution when requested, violates Due Process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1983). As the Supreme Court later clarified, there are three components of a true Brady violation: (1) the evidence at issue must be favorable to the accused; either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Evidence is material so as to establish prejudice only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 662, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Brady and its progeny apply only to evidence possessed by the prosecution team, which includes both investigative and prosecutorial personnel. United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).

In the case sub judice, the prosecution was in possession of the blood evidence, which contained the drug toxins which would have negated the intent element of the

67

crime charged and the unconstitutionally obtained statements. By withholding this blood evidence deliberately and in a covert manner the toxins were allowed to diminish to the point that petitioner's entire defense was ruined.

The blood evidence was drawn from the petitioner on January 29, 2004, the day of the incident, and was in the State's possession. The State has a constitution duty to preserve the blood evidence and maintain its chain of custody. Evidence of such an exculpatory nature should have been tested in a timely manner and provided to the defense before its contents are lost, diminish, and cannot be replaced. See Arizona v. Youngblood, 109 S.Ct. 333, 448 U.S. 51, 102 L.Ed.2d 281 (1988). The defense notified the State of its intent to present an intoxication defense (Rec.p. 325). Defense Counsel informed the Court that the blood issue becomes a "very critical matter" and that the blood was requested at numerous status conferences. Defense counsel stated clearly, "I'm stuck here and under Kyles v. Whitley, we are entitled to it". The Court made clear to the prosecutor that the defense has a right to this evidence under Migliore v. U.S., 409 F.2d 786 (5th Cir. 1969) (Rec.p. 328-330).

Petitioner submits that the State intentionally withheld the evidence for a period of 39 months. Petitioner avers that the State violated standard procedure pertinent to handling this evidence. The State failed to even maintain and/or present a proper chain of custody when the toxins within the blood evidence were allowed to diminish. The State suppressed evidence which played a major role in establishing a complete defense to the

68

charge of second degree murder. Moreover, had this evidence not been withheld and tested in a timely manner, the toxins within the blood evidence would have proven petitioner's mental incapacity when questioned by the police.

At the time petitioner was taken into custody, he was highly intoxicated and experienced major withdrawals during questioning. The police officers not only ignored petitioner's withdrawals symptoms, but they coerced two involuntary statements by promising him his medication. Prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police." When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight. Kyles, v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995).

The conduct of these officers was supported by testimony from the alleged victim's mother. (Exhibit-H). Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly v. Colorado, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Connelly has modified Louisiana's jurisprudential rule that intoxication may negate the voluntariness of a statement if it is of such a degree that it renders the defendant "unconscious of the consequences of what he is saying." State v. Simmons, 443 So.2d 512, 516 (La. 1983). Diminished mental capacity, which may result from intoxication, remains relevant to the voluntariness of a statement only to the extent

69

that it "made mental or physical coercion by the police more effective." United States. v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008).

Petitioner avers that he was intoxicated to the degree that he was "unconscious of the consequences of what he is saying." His statements were the product of a will overborne by police coercion. It is pertinent to remember in Corporal Kahrs' case narrative where he states that petitioner could not give consistent and coherent details when he arrived at the scene. (Appendix-E; Exhibit-I). Petitioner was transported to the Slidell Police Department within 15 minutes of the 911 call being made. It is untenable to argue that petitioner had the requisite mental capacity to give a voluntary statement.

It is well settled that the failure of police or prosecutor to preserve evidence may, in some circumstances, constitute grounds for reversal of conviction. It was the State's duty to preserve this evidence. See United States v. Bryant, 439 F.2d 642, 651 (1971) (Wright, J)(Government must make 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made). The Supreme Court in Brady v. Maryland and Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104 (1972), held that the Due Process Clause is implicated when a State intentionally or inadvertently destroys evidence that might have proved favorable to a criminal defendant.

Had the blood evidence not been withheld and tested in a timely manner, there is more than a reasonable probability that the outcome of the proceedings would have been different. The blood evidence would have established petitioner's mental incapacity

during questioning by the police; and would have greatly affected the credibility of State witnesses. The State repeatedly concealed the location of the blood evidence, the chain of custody regarding the blood evidence, and failed to test the blood evidence in a timely manner. (Appendix-E; Exhibit-C).

2) The State Coerced and Threatened Witnesses

I.

The next issue concerns the testimony of Catherine (Rena) Boyen which was obtained by threats and coercion. Petitioner asks as a question of law when serious allegations of threat and coercion are lodged against the State and names two witnesses in its appendix to the original post-conviction application presented to the district court to prove claim, why and how can the district court judge not be interested in hearing such a serious allegation through an evidentiary hearing? This allegation alone is a violation of both the Louisiana and United States Constitutions and is automatic grounds for reversal and or acquittal in some cases. The State in its response stated that "The record contains a signed order by this court commanding this witness to testify because she had been granted immunity. This is not coercion." First, when a witness is compelled to testify, in this case, Rena Boyen. She is compelled to testify to the truth. If the witness is <u>threatened to testify verbatim to her statement or be charged with perjury and multi-billed;</u> that is not the truth, this is coercion and perjured testimony due to threats by the State. Her account on the record shows that she testified that she was loaded and does not even remember

writing most of her statement. That the police told her what to write. She was was forced to testify to things that were false and inaccurate in her statement. The witness's testimony of Mr. Frank DeSalvo can support this claim to an extent and he communicated this to Ms. Rachel Yazbeck, petitioner's post-conviction counsel at the time. The content of this allegation communicated to Ms. Yazbeck was a phone call between Mr. DeSalvo and Mr. Noria, the prosecutor, after Mr. Noria found out that Ms. Boyen was not going to testify and be held in contempt of court. The testimony of Mr. DeSalvo is vital to this claim.

Two weeks prior to this trial commencing, was the original trial date. Rena Boyen was transferred from Tallulah to the St. Tammany Parish Jail and had not spoken to her retained counsel, Mr. DeSalvo, as he was picking a jury in federal court in New Orleans in the Danzeinger Bridge murder trial of five New Orleans police officers. The trial court granted a two-week continuance so that Mr. Regan could interview Ms. Boyen along with Mr. DeSalvo. Mr. Papillion Anderson accompanied Mr. Regan to this interview along with Mr. DeSalvo. For the record, Mr. Anderson is a licenced private investigator in the state. The three interviewed Ms. Boyen and explained the court order and her options. Mr. Regan and Mr. Anderson excused themselves from this interview, leaving her alone with Mr. DeSalvo where he explained she could be charged with contempt of court and sentenced to a maximum of six months for each question she refused to answer. Mr. Anderson and Mr. Regan were summoned back to the interview room and informed that

72

Ms. Boyen was <u>not going to testify</u>.

Fast forward to the start of the trial: First, Mr. Noria on the morning these threats and coercion takes place he misrepresents the truth advising his Honor that he spoke to Ms. Boyen that morning and she was going to testify. That Ms. Boyen was there on another matter. She was not there on another matter. <u>Not true</u>. She was on no other docket in any court that day. (Appendix-E; Exhibit-T). She was brought there and threatened with perjury if she did not testify verbatim with her statement. A lie within itself as her statement was not taken under oath. In Ms. Boyen's testimony in Exhibit-0, she states that Mr. Noria tells her that Mr. DeSalvo told Mr. Noria to tell her to testify. Mr. Regan clearly states he does not believe that. Ms. Noria then rambles on distorting the truth to the judge as to what happened in his conversation with Mr. DeSalvo.

How without the testimony of Mr. DeSalvo, Mr. Anderson, Mr. Regan and Ms. Yazbeck determine what the truth is regarding this <u>very serious allegation</u>? It would be unethical for Mr. DeSalvo to send the district attorney to advise Ms. Boyen to testify when he could have had an associate do so on his behalf or the jail inform Ms. Boyen to call him. The record will support that Ms. Boyen <u>never</u> spoke to Mr. DeSalvo after their meeting with Mr. Regan and Mr. Anderson prior to trial. This claim alone should require this court to remand this case back to the district court for an evidentiary hearing and a new trial.

II.

During pretrial proceedings, petitioner filed a motion to rescue Assistant District Attorney (ADA) Bruce Dearing because he threaten the victim's mother and prevented her from talking to defense. Mr. Dearing admitted that he spoke with the victim's mother, Jan Herrington Wroten, but denied advising her not to speak to defense counsel or any defense investigator. In fact, Mr. Dearing denied interviewing her. He stated that Ms. Wroten asked him about a potential suspect named Jason Thomas and inquired if Thomas had been investigated. Mr. Dearing, however, denied hearing that name interviewing Thomas. He referred her to the Slidell Police Department.

Mr. Dearing's handling of the information provided to him by the deceased's mother, Jan Wroten, demonstrates that his actions were in conflict with the fair and impartial administration of justice. Ms. Wroten testified at the pretrial motion hearing on January 31, 2008, that ADA Dearing advised her not to speak to the defense. Dearing's failure to advise petitioner's counsel of Ms. Wroten's exculpatory information coupled with his efforts to dissuade her from contacting petitioner or his defense attorney, clearly demonstrates that he has taken a position that is in conflict with the fair and impartial administration of justice.

### (C)

The prejudicial misconduct committed by the ADAs in this case is substantial and requires reversal of petitioner's conviction. The threats made against Ms. Boyen and Ms.

74

Wroten by ADA Dearing and ADA Noriea "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); see also, Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). As noted above, ADA Noriea threatened to prosecute, convict and sentenced Ms. Boyen as a habitual offender if she refused to testify against petitioner. On the other hand, Ms. Wroten testified at a pretrial hearing that ADA Dearing advised her not to speak to the defense. See Gregory v. United States, 369 F.2d 185 (D.C.Cir. 1966)(Where prosecutor stated that he did not instruct witnesses not to talk to counsel for defense but that he advised witnesses not to talk to anyone unless he was present and witnesses refused to talk to defense counsel, defendant was denied a fair trial.). The Fifth Circuit Court has held that

> "The Sixth Amendment guarantees a criminal defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government," and "the Fifth Amendment protects the defendant from improper governmental interference with his defense." United States v. Bieganowski, 313 F.3d 264, 291 (5th Cir. 2002)(internal quotation marks and citations omitted). "[A]s a general rule, '[w]itnesses ... to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.'" United States v. Soape, 169 F.3d 257, 270 (5th Cir. 1999) (quoting Gregory v. United States, 369 F.2d 185, 188 (D.C.Cir. 1966)) (second alteration in original).

United States v. Skilling, 554 F.3d 529, 567 (5th Cir. 2009). The threats made by the assistant district attorneys against Ms. Boyen and Ms. Wroten deprived petitioner of his Fourteenth Amendment due process right to a fair and impartial

trial.

## ARGUMENT IN SUPPORT OF CLAIM EIGHT

The trial court erred in finding the cumulative errors involved in this case demonstrate an unconstitutional conviction and trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

### (A)

Petitioner submits that he is entitled to a reversal of his conviction based on the accumulation of errors committed in this case. First, petitioner complains that he was erroneously charged and convicted under the second-degree murder statute which, as applied to him, is unconstitutional. He further assert that his defense counsel was grossly ineffective for failing to perform pre-trial discovery, investigation, failing to interview and call witnesses, failed to seek writs on issues crucial to the defense, and failed to put the State's case to meaningful adversarial testing.[23] Combined with the prosecutor's misconduct[24], petitioner was deprived of his constitutional rights to due process of law, to a fair and impartial trial, to present a defense[25], and to effective assistance of counsel.

With respect to the errors committed by defense counsel, the Supreme Court has recognized that "the right to effective assistance of counsel ... may in a particular case be

23 United States v. Cronic, a defendant is entitled to a presumption of prejudice if defense counsel failed "to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 658-89, 104 S.Ct. 2039
24 See, e.g., Darden v. Wainwright, 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (prosecutor's allegedly erroneous statements assessed in terms of "their effect on the trial as a whole")
25 Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)(The Constitution guarantees criminal defendants a "meaningful opportunity to present a complete defense.")(quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

76

violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial. Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)(citing United States v. Cronic, 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984), and Strickland v. Washington, 466 U.S. at 693-696, 104 S.Ct. at 2067-2069.). On the same token, the combined effect of multiple trial court errors renders the resulting criminal trial fundamentally unfair. Chambers v. Mississippi, 410 U.S. 284, 298, 302-03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)(combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); see also Taylor v. Kentucky, 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness....").

Cumulative error claims allows for relief when, although no single error independently warrants reversal or rises to the level of constitutional violation, the effect of multiple errors caused the defendant to suffer undue prejudice. Chambers, 410 U.S. at 290 n. 3, 93 S.Ct. 1038. As such, the cumulative effect and prejudicial impact of all the errors committed in this case deprived petitioner of his due process right to a fair trial. Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, courts must look to all the circumstances of the trial); Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)

(reviewing courts must be educated by the language throughout <u>Kyles</u> to look at the case as a whole).

Hence, the cumulative effect of all the errors together with counsel's unprofessional care and the prosecutor's prejudicial misconduct, demonstrate that petitioner was denied a fundamentally fair trial and effective assistance of counsel as guaranteed him by the fifth, sixth and fourteenth amendments to the United States Constitution.

## CONCLUSION

For the reasons set forth above, this court should grant petitioner's writ of habeas corpus and reverse his conviction and sentence. The court should grant whatever other relief the petitioner may be entitled to under the law.

Respectfully submitted by:

*Walter a Kott*

Walter A. Kott, Jr. #347318
Louisiana State Penitentiary
Angola, LA 70712

78